And our third and final argument of this morning is No. 17-1871, Philadelphia Taxi Association, Inc. et al., v. Uber Technologies, Inc. Mr. Zanelli and Reid. Mr. Zanelli and Mr. Reid. Whatever you're ready. May it please the court? John F. Zanelli on behalf of the appellants, only the available. In October If you wish to reserve any time for rebuttal. Yes, I'm sorry, Your Honor, five minutes for rebuttal. Okay. In October of 2014, Apelli, Uber, a multi-billion dollar international company Can I just ask at the outset? Yes. I have a question about sequencing of the argument here. People are talking about injury. But don't you have to have an antitrust violation to begin with? In this case, perhaps an attempted monopoly? Yes. So why don't you deal with the attempted monopoly first. Okay. And then we can deal with the injury issue second. The attempted monopoly has three components. As we point out in the complaint, that there needs to be injury to competition. What's the product market here? The product market here is the provision of safe transportation within the city of Philadelphia. I thought the argument was that you had to have a medallion in order to do that. And that was the market. Okay. The product market. The medallion is, in fact, key to the market being safe transportation for cabs within the city of Philadelphia. So if that's the market and Uber's not even in that market, how is the medallion system for cab driving the product market here? I need to be much more clear about what the market is. The market is transportation within the city of Philadelphia. Taxi cabs and limousines fall under the Act of July 2004. And in order to make that marketplace one which was operative, because prior to 2004, the nature of taxi cabs and the provision of services that they provided was poor to say the best. So what the state did was have a system enacted. And a key element of the system was the existence of medallions. And the purpose of the medallions was to create a means by which cab owners could get the necessary revenue, because the medallion could be used as collateral to fund cars, cabs, in conformity with the safety requirements that were being implemented as set forth in the 2004 Act. So is that why initially there was an attempt to define the market as certificate-holding taxi cabs or certificate-holding vehicles? Yes, because what you would get would be a certificate. But Uber drivers, and I assume Lyft drivers, never held a certificate. That is correct. So how are they part of the market? Well, what they did was they came in with their cars and attempted to conduct business within the geographic market, the city of Philadelphia. But if by definition they're not in the market, then we don't have an antitrust violation. Then you don't have an attempted monopoly. Oh, we do have an attempted monopoly. They come into the city in violation of the Act of July 2004 and don't comply. But the cases have held that illegality is really not relevant for purposes of the antitrust laws. That doesn't get you there. It's wrong, it shouldn't be, but it doesn't get you there. The issue of illegality in and of itself is not what's at hand here. The Uber came in and they had their cars come in, and the Philadelphia Parking Authority, which is the sub-governmental unit, made every effort to enforce the market by saying to Uber, How is it anti-competitive? Well, what it has done is it has driven competitors out and created a situation in which one entity, one player, can control the market. So you're complaining of monopoly and competition here. This sounds like it's pro-competitive. I mean, you've got more people in the market, and so the consumer should be better served, or at least with lower cost, because it's pro-competitive. It's not anti-competitive. I'm missing something. Well, it is anti-competitive. If you have cabs that are being operated under state law, the July 2004 Act, and being enforced by the Philadelphia Parking Authority, and that law requires all sorts of standards for the vehicles, it creates a cost of operation for the cab companies. In order for the cab companies to be able to finance cars that meet those standards, they need the medallion system. Why doesn't all of that just go to market share? And we know from Spectrum Sports and Crossroads co-generation that attempted monopoly requires more than cutting into market share. You need to show anti-competitive conduct, barriers to entry, intent to monopolize. Correct. Where do we have that here? What we have here is a situation where Uber comes in. It is not in compliance with what... We know that. We know it's illegal. And we also know from Atlantic Richfield, as Judge Rendell mentioned earlier, that the unlawful nature of Uber's market entry makes no difference. It is not the illegal nature in and of itself. It is non-compliance with a rule that is applicable to all vehicles, as Judge Carpenter, in her opinion, which is exhibit... How does that decrease competition in the marketplace? Even if it decreases the market share of your client, how does it decrease competition itself? How does it decrease competition itself? By driving competitors out. One company now, Uber, would be in a position to set prices. Uber would be able to decide, once it has a dominant position, to raise barriers of entry. But they haven't. They haven't. And competition is viewed from the standpoint of the consumer. The consumer now has a lot more choices, do they not? So isn't that pro-competitive as compared to anti-competitive? No, not necessarily. There's a segment of the population which can't afford Uber or is uncomfortable with Uber. And so they'll continue to come to your client. How have you shown... I mean, even with your own representations, your client is in the marketplace, although with decreased share. Uber's in the marketplace. Lyft is in the marketplace. So if you don't like Uber and you choose Lyft, so what's the problem? As Judge Posner pointed out, you have more choices. I think the clearest thing to do is to point to the differences that exist in the nature of the competition. The mere increase in the number of vehicles in the geographic marketplace does not, in and of itself, create increased competition. The question is, what does the conduct of Uber do? It forces out competitors. It has the ability to force out competitors. Actually, this is not on the record, but what it does make is your city cabs are a lot friendlier. They're cheaper. They ask for your input. And the system seems like it's a whole lot better than it was just a few years ago. Well, I don't know that to be— Well, I mean— I do not know that— I'm just telling you from my own personal experience, whether it be in D.C. or Philadelphia or New York, it's a different system. It's a one where it's cheaper, people are friendlier, and so what's—that sounds like to me it's pro-competitive. What's the problem? Going back to 2004, cars became—and we cite this in— By the way, hasn't that law now been changed anyway? No, it has not. In other words— What has happened now is there's a two-tier system. The 2004 Act has had an amendment to it. What was the change in 2015 or 2016? Wasn't there a change then? Yes. And what was that? And that relates solely to Uber. It changes the obligations of Uber. It does not change the obligations that exist of the cab companies. The cab companies now have the same cost overhead that they always had. They have to provide insurance. Their cars have to be of a younger tenure. There has to be set prices given in the way of wages to the cab drivers. They have the same cost structure that they had going back to 2004. They had the medallions. The medallions are important because that enabled them to go ahead and use it as collateral to buy the new cars. You can't have a 12-year or 13-year-old car if you have a cab, but you can for Uber. Uber now can come in and it can decide whatever price it wants under any given terms it wants. Dynamic pricing causes that. The cab companies do not have that. But your gripe really is with the legislators, is it not? No, it isn't. Or the people who enforce the laws. The legislation was written by Uber. The legislation in and of itself is not the state's own. In order to get the legislation passed, the delegation of state legislators from the city of Philadelphia said, we're not going to vote for it. And they didn't vote for it until they were given money in the form of a certain percentage of the revenues every year for the school district. That's why the Parker immunity is not applicable in this situation. So what is the anti-competitive conduct by Uber that caused you to claim that your association members were injured? It's the differential that exists between the requirements under the 2004 Act, which is still in effect, to operate the taxi cabs, versus the absence of the same requirements being imposed upon the Uber vehicles. And that distinction makes all the difference in the world as to what the pricing schemes are. It is not a level playing field. And the definition, and the reason why Uber would have to be under the auspices of the Philadelphia Parking Authority, is that these are vehicles where calls are made. And under the statute, as we set forth, I think it's the Exhibit 2 to the second amended complaint, we have Judge Carpenter's opinion stating very clearly that the apps on smartphones used to call a ride for hire are within the definition of a telephone call or a hail, and thus such vehicle is subject to the regulations of PPA as dictated by the legislature. That opinion was issued on February 18, 2006, before the legislation was changed. From the start, there was an obligation for Uber, if it wanted to be in this market, to comply with the 2004 Act. But you're arguing to us, not that illegality per se, but an antitrust violation, or antitrust, relatedly antitrust standing. Yes. And so what happens is, as a result of the differential, the cab companies are being driven out of business. And what that does is it is moving toward, and we cite the example, we cite statistics. Isn't that the marketplace? I'm sorry? And certain people cannot keep up. Isn't that what the marketplace is all about? That is what a marketplace is about. We have here a regulated marketplace that put a group within, that in order to bring about good, safe cabs back in 2004, which is the time period in which the Philadelphia cabs began to rise in esteem throughout the entire United States. In their complaint, we cite the examples. So it really seems to come down to, I think what Judge Krause has said, isn't your complaint really with the people who make the rules? I mean, we haven't even got into an associational standing whether you have that. Because we don't have to get there if there's an attempted monopoly, for example. Right. Well, the allegation is it's an attempted monopoly. I understand, but that's what we're testing here. We don't have to demonstrate that a monopoly has been achieved. But what we do is demonstrate the number of vehicles, the medallion vehicles, the taxi cabs, that have been forced out of the market. And the percentage increase of vehicles that are in the market that belong to Uber. It is moving, Uber is moving as it grows to the point where it will be the only. What percentage today roughly is Uber? Well, at the time that we filed the complaint, it was 68%. But where's the intent to monopolize? The intent to monopolize is in the initial action that was taken. Knowing what the law required and avoiding it. Well, but if you have a gas station on four corners, and one of the gas stations lowers its price by 50 cents, and therefore everybody buys gas there, are you going to say that therefore is an attempt to monopolize? No, that's not an analogous situation. What we have here is a company saying that we are not Uber, saying we are not a cab or a limousine company. And therefore, we do not have to comply with what the standards are to be a taxi cab or a limousine. And then they intentionally drive away, pull away drivers from the taxi cabs so that there are more cabs sitting idle. They put those drivers in vehicles that are their own vehicles, Uber vehicles, say that they're Uber, that do not comply with the then existing requirements for safety and still are not applicable. What we'll do is I'll save my associational standing questions for rebuttal, because you do have a significant amount of time. We've gone probably about seven minutes over what you initially had allotted. Any further questions? Just an associational statement. Yes, same here. We'll get you back. Whenever you're ready, sir. Good morning, Your Honors. Steve Reed, representing the Appellee Uber Technologies, Inc. I'm very honored to be here, Your Honors, before you and particularly with the audience in the room. It's, I think, appropriate that we are in front of a group of eighth graders. This is a group of individuals who will see innovation in their lifetime that we can't even imagine. And that innovation will challenge incumbent businesses and industries. And some of those businesses and industries will adapt, as Judge Ambrose observed. We may see improvements in their services, and some of them will fail. But the concern here is that there was an entry into the market that was against the regulations then in place, and people are upset about it because a number of them are losing their ability to do their livelihood. So explain how the injury stemming from this presence that was against the regulations in the market would not be an antitrust injury. So, Your Honor, I think, as you observed, the law is very clear and has been for quite some time that even illegal entry, even if there were illegal entry here, that's not enough to establish antitrust injury, which is a requirement to have it standing under the antitrust law. So that's, you can look at the decision in Brunswick. Right, and indeed, the Sigma Forum decision addressed that as well. And, Your Honor, I think Judge Rendell, you wrote that opinion, and Judge Ambrose, you were on that panel, and you both observed that even a per se violation of the antitrust laws would not be enough to answer the question whether there was antitrust injury giving rise to antitrust standing. Judge Rendell, I think what you wrote in that opinion is that the key question is, is the plaintiff's injury the type that the injured, excuse me, that the antitrust laws are intended to forestall? That's the question here, Your Honor, and this case is all about, we heard, I think what you heard very clearly is that the appellants are concerned about the law. We asked Mr. Anelli, and he spent much of his argument on the question of stating the claim for violation as opposed to the antitrust injury per se. And what is, in your view, what is the right order to address those questions? Because the case law does seem rather all over the place, sometimes assuming a violation to address antitrust standing, and sometimes addressing the question of violation at the outset and putting aside standing. Is there a right way to proceed? And as we address this question, is that something we should clarify in the context of this case? Your Honor, I would suspect that might be Fielder's choice. Let me tell you, though, that antitrust standing is a prudential concept. We're not talking about Article III standing. This is prudential standing, and it's been viewed as an element of the claim. There are courts that have said more than once that standing ought to be addressed as a threshold issue, and certainly that's what Joe Sanchez chose to do here. Frankly, that's how we briefed it for him, and we thought that made the most sense before you got into the elements of the claim, which I'm happy to address as well. You have to ask the question, do they have standing to assert those claims? And here, frankly, I think it's glaringly obvious. This is a claim where a competitor is complaining about increased competition. Not harm to competition, but increased competition. And the law, again, is very clear that time and again, in the Brunswick case at McRichville, Cargill, the Supreme Court has said that competitors do not have standing to bring antitrust claims based upon increased competition. That's not the type of harm the antitrust laws are intended to address. So how about the attempted monopoly? I mean, there has been a very large drop in the number of cabs, increased use of Uber, and Uber actually raising its prices depending upon time of day, location, etc. How do you debunk the idea that there is an attempted monopoly here? Well, so I think the answer is on many different grounds, and these are alternative cases to affirm Judge Sanchez's opinion. As you know, there's three elements for a Section 2 Sherman Act claim. You've got to have specific intent to harm as opposed to compete. There's no allegations that Uber was here to harm the taxi companies. Uber was here to compete. That's one. You have to show a dangerous probability of success. Actually, before I even get there, the second element is you have to allege, and ultimately prove, anti-competitive conduct. And they haven't alleged any anti-competitive conduct. As the law is clear, as this panel has observed, simply violating the taxi regulations, even if that in fact happened, is not an antitrust violation. What about raising prices? If it were to raise prices across the board, then it would be anti-competitive, would it not? Well, not necessarily, Your Honor. So competitors are free to raise their prices or lower their prices. A competitor may say, you know, I'm not satisfied with my market share. I'm going to lower my prices in order to grow my share. Another competitor may say, you know what, I'm more interested in margin. I'm going to sell a higher quality product. I'm going to recognize that I'll have less volume, but I'll make more margin on that product. What if they've done that after forcing out others? Well, Your Honor, so if they indeed achieved a monopoly, and of course under the antitrust laws it's not illegal to have a monopoly, right? But even if they were to achieve their monopoly, what they would have to show, and this was not pled in the complaint, is that they had market power in a relevant market. So this gets back to Judge Ambrose's question about what the market is. And I think this is an issue that the plaintiffs, the appellants here have struggled with because they're varyingly defining the market to include Uber and to exclude Uber. But the fact is, again, so this is something that was taught by Queen City. You have to, among many other cases, you have to look at reasonable substitutes. And if the service that's provided here is getting from point A to point B within Philadelphia, then I think there are plenty of options. There are school buses that I imagine some of our guests arrived in today. There are SEPTA buses. There are trolleys. There are trains. There's regional rail. There's bicycles. But if the relevant market were cars for hire, that's much more limited. Well, that's limited, but there's still substitutes. There's still plenty of competitors between cabs and Uber and others. And if you look at the complaint, I think what they've alleged is that there are over 500 cab companies. Well, we're looking where the claim is for attempt. We're not looking only to the state of current affairs, right? And you rely heavily on Matthews to argue that the kind of conduct and standing as well that we would need to see would be some effect on prices or quantity or quality of goods or services. But in other contexts, as in predatory pricing, the court has said you don't need to have that showing. And why isn't attempted monopoly in the same vein? So, Judge Krause, I agree with you. I think that the typical impact on competition that you look for, increased price, reduced output, or a market-wide reduction in quality, but that's not an exclusive. And I think the Third Circuit's right about that. So you could have exclusionary conduct. And if that exclusionary conduct causes harm of the type that the antitrust laws are intended to forestall, one, that could give you standing, antitrust standing. But again, when we're talking about an attempted monopolization claim, a Section 2 Sherman Act claim, the third element that you have to look at is a dangerous probability of success. And that's where you need to define a market. Among other things, you have to look at whether there are actually barriers to entry. Remember, this is really kind of a unique situation in which Uber is the new entry. And Uber, a new entry, is being accused of attempted monopolization. All the conditions that existed that allowed Uber to enter the market exist for others to enter the market as well. So I think Judge Ambrose and I believe Judge Rendell referenced Lyft earlier, right? That's not in the record, but you can take judicial notice that there are other transportation networks like Uber out there. And if, and this is a big if, I'm accepting your hypothetical, if Uber ever got to the point where through its innovation and legitimate competition achieved a monopoly and then decided it wanted to charge super competitive prices, it would leave itself open to the exact same thing that it did in Philadelphia a few years ago, right? Somebody else would come in and offer a better service, a more innovative solution, or a lower price, and they would not have the ability to extract a super competitive price. They've put forward in their allegations the market share that's been taken, the illegal conduct, at least initially, to get there, the taking out of the marketplace of taxi drivers. We're at the motion to dismiss stage. Why isn't that enough where it is, as you acknowledge, with attempted monopoly, we don't have to have specific allegations as to an effect now on prices and quantity and quality. Why haven't what they've alleged, including predatory pricing and effects that they allege are already manifesting themselves in the marketplace enough to survive a motion to dismiss and get discovery as to whether there are, for example, barriers to entry? So a few answers to that. First of all, this is the complaint before you is their third attempt to plead. So they've had multiple attempts. In response to our initial motion to dismiss, they chose to re-plead. We moved to dismiss again, and after a lengthy argument, Judge Sanchez wrote a long opinion explaining the defects in their complaint, and they tried it a third time, and then Judge Sanchez dismissed it. So one answer to why not another chance is that. But beyond that, I think we're making assumptions about what they've pledged in the complaint that are actually not well-founded. They have not pled, but I think you've heard them. If I've missed it, I apologize, but, for example, they've not pled that Uber had 68% of the market. What they've pled was that 15% of their medallions were confiscated. That's Paragraph 6, Appendix 204, and that 17% of their drivers switched Uber. That's Paragraph 54 in the Second Amendment complaint, Appendix 203. Judge Cross, they did not allege predatory pricing. What they allege or attempted to allege is predatory hiring. But here it's really important to distinguish. In the case, the one case that they rely upon is West Penn. And the facts in West Penn and the allegations in our case could not have been more different. West Penn was a situation in which there was an alleged conspiracy. A suit between competitors, there was an alleged conspiracy between an insurer and UPMC, the defendant hospital system. The UPMC was alleged to have a group of community hospitals. If you enter into an exclusive two-month venture with us, we're going to build a satellite facility next to you. UPMC admitted that they went after to hire the best doctors at West Penn, paid them more money than the market would bear, and sidelined them. They exclusively recruited away their talent so that they didn't work. They also published false financial information that was sent to West Penn's financial folks and actually drove up the cost of West Penn's financing. And what the court found there is that, viewed as a whole, that conduct was sufficient to allege anti-competitive conduct. Here, what they've alleged is that Uber went to 30th Street, handed out information about driving for Uber, handed out an application, and promised some money for gas. And they don't allege that Uber sidelined these drivers. They don't allege that Uber said that driving for us is exclusive, that if you drive for us you can't drive for Lyft and you can't drive for a cab company. Not only that, they actually allege in their complaint that Uber does not employ drivers. So the closest they come, Judge Krause, to alleging anti-competitive conduct, in my view, is this notion that there was predatory hiring. And I will admit under West Penn, under those circumstances, that may be enough to survive a motion to dismiss. But I really invite you to review the complaint that they filed and the specific allegations they made. And I think what you'll conclude is that they haven't alleged nearly enough here. Can you address the associational standing issue? Since you and I have another opportunity. Yeah, I'm happy to. Frankly, to me, it's a bit of the tail wagging the dog. So we have, in addition to a bunch of individual taxi companies that are plaintiffs, there was an association that was formed, I believe for the express purpose of bringing this lawsuit. The law on associational standing is pretty clear. And I believe at least one member of this panel has written on that subject. But what Judge Sanchez found was that they had failed to allege associational standing. One, because, and this is the first element, their members lacked standing. So if the cab drivers didn't have standing, then the association can't have standing. I mean, I'm not sure this is a tail or a dog that we can avoid in this case. Because associational standing in that finding seems to be an Article III standing question. And there's no question. Is there that even the individual members have Article III standing? So to the extent that they claim harm caused by conduct, then yes, they would have Article III standing. And the Hunt first prong deals with that kind of standing of the individual members. So we do have that here, contrary to the District Court's finding. Okay. So I think even if that holding was in error on prong one, they still fail under prong three, because prong three requires them to be able to proceed without the participation of their members. And here, the members' participation is required. But don't we also take from Hunt that prong three is prudential, not jurisdictional? And so if we're satisfied one and two, then there is associational standing as to Article III standing, and we're back to the question of stating a claim or antitrust standing. Well, I think, and I think perhaps we're not being fair enough to Judge Sanchez, and maybe I gave too soon on prong one. The only count here, the only claim in this case is the antitrust claim, right? There's just one count. It's Section 2, attempted inopposition. And you're back to the question, is the harm that they allege the type of harm that the antitrust laws are designed to prevent? But that's not an Article III standing question. Well, but so what standing do they have left to bring that claim?  In terms of sequencing, does it make any difference? If you don't have attempted monopoly, does it make any difference if you have standing? If you don't have standing, does it make any – I mean, you have to have both in the end. Well, I think that's right. Fairness to Judge Krause's question. I mean, so had Judge Sanchez gone on and addressed the adequacy of their substantive pleading on Section 2 claim and concluded they had failed to plead a claim, as I think is clear and as we've addressed in our papers, then the association's claim would go as well, right? It has no claim independent of the claim that the drivers have asserted. But Article III standing is, you'd agree, a threshold issue. Oh, clearly, Article III standing is a threshold issue, right? But even if you get past that, they have no claim because this did not pled an antitrust violation. Thank you. Thank you. Mr. Nellie, associational standing. I think that's Your Honor, Judge Krause said it all. No, that's Article III standing. I am asking questions and not advocating. We didn't want to hear your arguments. Well… Don't you have to have associational standing? Don't you have to have standing of members of the association? Yes. In other words, the question here is whether the damages claims are common to the entire membership. Yes. And are they shared in equal degree? I mean, wouldn't it be the case that some – you have to show that they're shared in equal degree. Aren't some people – isn't it likely that some are going to do worse than others, some are not going to be affected at all? Well… I think what can be said is that what would be impacted is the existence of the medallions. And that can be something which affects all of the members across the board. Again, the medallions are important. They constitute collateral. As the members of the association are driven out of business… They constitute collateral for those who have the medallions. But if you don't have the medallion, there isn't collateral. And what's that have to do with antitrust? Well, as – again, going to… The current trend is that CAVs are being pushed out of business, making the medallions worthless. As the process continues, all of the members of the association will be in the same position. They will all be driven out of business. That's what the data that we have and set forth in the second amendment complaint show. So either the CAVs adapt where you have others in other entities like Lyft and others, there will still be competition whether or not – if the CAV drivers, taxi-CAV drivers adapt to the changing circumstances. In other words, the concern people have, where the final appeal is, it appears to the blank response that what's happening here is pro-competitive. I've said it before, for consumers. And if it's pro-competitive and we're not yet at the place where somebody controls the only – the only tollkeeper to the bridge and therefore has the monopoly, and we don't have any indication that there is – I mean, you have allegations, but no evidence that I know of that there – this was attempt – the intent was to have a monopoly. What's the problem? What the problem is, is that there will be a monopoly. Maybe, and you have to show that there's an intent to get there. And there is an intent to get there by the actions engaged in. At the time that the second amendment complaint was filed, it was shortly after. But so the monopoly would be the ability to set prices, right? That's absolutely right. So where in your complaint do you allege Uber's current ability to set prices? I mean, as you're – as Mr. Reed said, you talked about the alleged predatory hiring, but not predatory pricing. Well, Uber was charging whatever prices it wanted. The cab companies have a – Uber cab companies, they have – the ability to set prices. Or force cabs out of the market. Well, we do talk about forcing cab companies out of the market. Okay, but where do you set – where do you allege the current ability or the dangerous probability to set prices? It might be there. I just couldn't find it. Yes. Thank you. If you want, I'll give you a lifeline. You can submit a 28-J letter after our argument. Thank you. It'll make life easier. I very much appreciate it. Thank you very much. Thank you to both counsel. Very interesting cases. And we'll take the matter this morning and we'll take the matter under advisory.